# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| TYWASKI KING | CIVIL ACTION NO. 16-1745 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| JAMES M. LEBLANC, ET AL. | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment (Record Document 32) filed by Defendants Gary Carter, Jerry Goodwin, John Huey, and James LeBlanc. Defendants Gary Carter ("Lieutenant Carter") and John Huey ("Captain Huey") are correctional officers at David Wade Correctional Center ("DWCC"). Defendant Jerry Goodwin ("Warden Goodwin") is the Warden at DWCC. Defendant James LeBlanc ("Secretary LeBlanc") is the Secretary of the Department of Public Safety and Corrections ("DPSC"). Defendants seek dismissal of Plaintiff Tywaski King's ("King") Section 1983 claims against them in their individual capacities. King has opposed the motion, arguing genuine disputes of material fact exist that prevent the entry of summary judgment. See Record Document 35. For the reasons set forth below, the Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

King is an inmate incarcerated at DWCC. On or about June 26, 2018, at the direction of Steve Hayden, Director of Mental Health Services at DWCC, King was placed on suicide watch. See Record Document 34-4 at ¶ 4(b). King was "stripped of all implements that might assist suicide, including clothing." Record Document 32-2 at 1.

On or about June 28, 2016, Captain Huey placed another inmate, Willie Rose ("Rose"), in King's cell. See Record Document 34-4 at ¶ 4(c). Rose was fully clothed and was not on suicide watch. See Record Document 1 at ¶ 21; Record Document 25 at ¶ 21. Captain Huey stated in his affidavit that Rose was placed in the cell per instructions from Colonel Lonnie Nail. See Record Document 34-4 at ¶ 4(c). King alleges that Captain Huey "had personal knowledge of Rose's intent to attack . . . King and/or knew of the potential risk of attack, and placed him in the cell for that purpose." Record Document 35-6 at ¶ 2. Conversely, Captain Huey asserted in his affidavit that "Rose expressed no protection concerns" regarding problems with King. Record Document 37-2 at ¶ 4(g). Captain Huey also stated in his affidavit that he did not instruct Rose to attack King. See id. at ¶ 10.

Ultimately, it is undisputed that King was left restrained in handcuffs in the cell while Rose was not restrained. During this time, Rose physically attacked King. King had no ability to defend himself because he was restrained with handcuffs. See Record Document 1 at ¶ 22. King maintains that Captain Huey (1) knew King was restrained and that Rose was unrestrained; and (2) left King restrained intentionally. See Record Document 35-6 at ¶¶ 3-4. In his affidavit, Captain Huey declared:

> 4. (d) Prior to placing offender Willie Rose into Cell 8 with offender Tywaski King, affiant instructed offender King to come to the cell bar door to have handcuffs placed on him. Offender King complied with affiant's instructions. After offender King was handcuffed with his hands in front of him, affiant instructed offender King to step away from the cell bar door so that offender Rose could be escorted into the cell. After offender Rose was escorted into Cell 8, his leg chains were removed. After leg chains were removed from offender Rose, affiant exited Cell 8 and the cell bar door was closed.

>       (e)     Affiant instructed offender Willie Rose to come to the cell bar door to have his handcuff[s] removed. Offender Rose complied with affiant's instructions. Affiant exited Housing Unit N1, Tier D.
>
>       . . .
>
>       5.      On June 28, 2016, at approximately 1709 Hours (i.e., 5:09 p.m.), affiant inadvertently left a pair of handcuffs on offender Tywaski King, after escorting and placing offender Willie Rose into the cell assigned to offender King.

Record Document 37-2. King testified in his deposition that he called out to Captain Huey and told him about the handcuffs being left on. See Record Document 35-2 at 2. King explained:

>       Q       All right. After the handcuffs were taken off of Willie Rose, tell me what you remember occurring next.
>
>       A       Well, they took the handcuffs off Mr. Willie. I was calling Captain Huey. Like I said, he had told Carter, he got me, so Carter left. I think, a little bit, like over the wall, so he was kind of in the back, so I calling Huey, telling him about the handcuffs. So, the guys on the tier telling him dude got the handcuffs on. . . .
>
>       Q       When Willie Rose was placed in the cell and you started calling out to the Captain about still having handcuffs on, was he still on the tier at that time?
>
>       A       He was in the process of leaving – yeah. He was on. He could hear me.
>
>       Q       He could hear you?
>
>       A       The tier is pretty long.
>
>       Q       Do you remember where, on the tier, you were housed? Were you closer to the exit door of the tier, were you back closer to –
>
>       A       Closer to the front.
>
>       . . .
>
>       Q       All right. So, if I'm understanding what you just said correctly, on June 28, 2016, you were in a cell that was closer to the front –

A       Yes, sir.

        Q       -- of the tier. Right?

        A       Yes, sir.

        Q       You called out to the Captain and you say he was in the process of leaving off the tier. Do you remember what you called out—what you were trying to tell him?

        A       Tell him I got cuffs on, calling Huey. I'm just –

Id. at 2-4.

King further alleges that Lieutenant Carter, who he contends was responsible for making rounds, wholly ignored the substantial risk of serious harm and violence King faced, failed and refused to adequately monitor him or his cell, and failed and refused to timely intervene. See Record Document 1 at ¶ 23. In his affidavit, Lieutenant Carter stated that he made rounds in Housing Unit N1, Tier D on June 28, 2016 at approximately 5:15 p.m., 5:25 p.m., and 5:40 p.m. See Record Document 37-3 at ¶ 4(d). He observed a fight between King and Rose at approximately 5:43 p.m. See id. at ¶ 4(e). Lieutenant Carter declared that he attempted to activate his beeper, but was unsuccessful. See id. He gave Rose a direct verbal order to stop fighting and to go to the back wall. See id. Rose complied. See id. Lieutenant Carter then yelled for Sergeant Guillot, another correctional officer, to activate his beeper. See id. Captain Huey and two other correctional officers then arrived on scene. See id.

Lieutenant Carter stated that King "at no time" informed him that a pair of handcuffs were inadvertently left on him. See id. at ¶ 6. Lieutenant Carter likewise stated that he never deliberately or intentionally left a pair of handcuffs on King, nor was he instructed by Captain Huey to leave a pair of handcuffs on King. See id. at ¶¶ 7-8. Yet, in his

deposition, King testified that Lieutenant Carter was in close proximity to Captain Huey when King called out to inform Captain Huey that he was still handcuffed. See Record Document 35-2 at 4. Specifically, King stated:

> Q   What about Lieutenant Carter, was he still on the tier or was he leaving off too?
>
> A   He was leaving off too. He was in front of Huey, so – they both in the process of leaving off the tier.

Id.

After the fight, both King and Rose were examined by medical personnel at DWCC. See id. at ¶ 4 (g); Record Document 37-2 at ¶ 4(j). Both Lieutenant Carter and Captain Huey maintain that "there were no visible signs of injury to either offender." Id. King complained of pain in his face, chest, and abdomen. See Record Document 1 at ¶ 24. He was given ibuprofen and ointment. See id. He alleges he has lingering physical pain from the incident. See id. at ¶ 25. King further alleges that the medical treatment he received after the incident was inadequate. See Record Document 35 at 1.

King filed suit against Defendants alleging violation of his Eighth Amendment and equal protection rights. See Record Document 1 at ¶¶ 38-41. He also made claims for intentional infliction of emotional distress and inadequate medical care under Louisiana state law. See id. at ¶¶ 42-46. Defendants have now moved for dismissal of King's Section 1983 claims. See Record Document 32. The defense motion does not appear to address all of King's Section 1983 claims or any of the Louisiana state law claims.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard.

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir. 2004).

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553 (1986). If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response. See Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine [dispute] for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be

granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir. 2005). Where the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. See Scott v. Harris, 550 U.S. 372, 378, 127 S.Ct. 1769 (2007). In sum, the motion for summary judgment "should be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied." Celotex Corp., 477 U.S. at 323, 106 S.Ct. at 2553.

**B.    Qualified Immunity Standard.**

"Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right." Mace v. City of Palestine, 333 F.3d 621, 623 (5th Cir.2003). Once the defendant raises the qualified immunity defense, "the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." Brumfield v. Hollins, 551 F.3d 322, 326 (5th Cir.2008).

The court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. See Freeman v. Gore, 483 F.3d 404, 410 (5th Cir.2007). First, the court must determine whether the defendant violated the plaintiff's constitutional rights. See id. "If so, [the court] next consider[s] whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." Id. at 410-411. Even on summary judgment, courts cannot ignore that qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Poole v. City of Shreveport, 691 F.3d 624, 627 (5th Cir. 2012).

### C. Section 1983 Eighth Amendment Claims.

The Eighth Amendment imposes duties upon prison officials to take reasonable measures to guarantee the safety of the inmates. See Farmer v. Brennan, 511 U.S. 825, 832, 114 S.Ct. 1970, 1976 (1994). This duty includes protecting prisoners from violence at the hands of other prisoners. See id. at 833, 114 S.Ct. at 1976. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834, 114 S.Ct. at 1977. A prison official violates that the Eighth Amendment only when two requirements are met. See id. "First, the deprivation alleged must be, objectively, 'sufficiently serious.'" Id. In a failure to prevent harm case, this means "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." Id. The second requirement is that the prison official acted with deliberate indifference. See id. "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." Id. "In order to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995).

<u>Claims Against Captain Huey and Lieutenant Carter</u>

Here, King alleges that Captain Huey and Lieutenant Carter engaged in unlawful and unconstitutional actions based on deliberate indifference, gross negligence or reckless disregard to his safety and security. Captain Huey and Lieutenant Carter have asserted qualified immunity as to King's failure to protect claim. See Record Document 32-2 at 5. They argue they were unaware of a substantial risk of serious harm to King,

and thus did not fail to protect him. See id. at 7. They also argue that "it was not clearly established in 2016 . . . that a lack of knowledge and a reasonable opportunity to prevent harm . . . was a violation of a constitutional right." Id. at 9.

The Court finds there are genuine disputes of material fact preventing summary judgment as to King's Section 1983 Eighth Amendment failure to protect claims against Captain Huey and Lieutenant Carter. Due to conflicting summary judgment evidence, credibility is at the center of whether King potentially suffered a violation of his Eighth Amendment right, that is, whether he was detained under conditions posing a substantial risk of serious harm and that prison officials were deliberately indifferent to his need for protection. It is undisputed that King was left in the cell handcuffed and stripped of clothing while Rose was unrestrained and fully clothed. The factual issue preventing summary judgment is whether Captain Huey and Lieutenant Carter knew, and/or at what point they knew, that King was left in handcuffs and failed to remove such restraints. Both correctional officers deny knowledge and argue inadvertence on the part of Captain Huey. Yet, as set forth above, King's deposition testimony raises a genuine dispute of material fact as to whether Captain Huey and Lieutenant Carter heard King calling out about the handcuffs and chose to ignore King, leaving him in the same cell as a known violent offender. See Record Document 35 at 5. Moreover, the Court finds that Defendants' argument that "it was not clearly established in 2016 . . . that a lack of knowledge and a reasonable opportunity to prevent harm . . . was a violation of a constitutional right" is vague and/or insufficiently developed. Record Document 32-2 at 9.[1] Thus, summary

---

[1] It appears that Defendants may be arguing that it was not clearly established in 2016 that correctional officers should not place a naked, handcuffed inmate on suicide watch in the same cell with an unrestrained inmate with a known reputation for violence. This

judgment must be denied as to King's Eighth Amendment claim against Captain Huey and Lieutenant Carter.

Claims Against Warden Goodwin and Secretary LeBlanc

King alleges that Warden Goodwin and Secretary LeBlanc were decision makers and acted with deliberate indifference, gross negligence, and reckless disregard to his safety, security, and constitutional rights by maintaining, permitting, or acquiescing in the following policies, practices, or customs:

- a. Subjecting people with known mental health concerns to an unreasonable risk of violence against their persons by corrections staff and other inmates;

- b. Selecting, retaining, and assigning employees with demonstrable propensities for violence, negligence, and other misconduct;

- c. Failing to adequately train, supervise, and control employees in the dangers of placing in the same cell inmates on "suicide watch" and inmates who are not;

- d. Failing to adequately train, supervise, and control employees in the dangers of placing in the same cell inmates who are cuffed and inmates who are not, and failing to check inmates to ensure such dangerous circumstances do not occur;

- e. Failing to adequately train, supervise, and control employees in the dangers of placing in the same cell uncuffed, fully-clothed inmates with violent histories and cuffed, naked inmates on suicide watch due to mental health concerns, and failing to properly ensure such dangerous circumstances do not occur;

- f. Failing to adequately discipline officers involved in the negligence or misconduct such as occurred against . . . King; and

---

argument was briefly addressed, and rejected, by the Magistrate Judge in a Report and Recommendation filed on July 20, 2017 and adopted by the undersigned on August 7, 2017. See Record Documents 20 & 21; see also Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508 (2002) (prison officials not entitled to qualified immunity, despite the lack of prior decision on point, for cuffing a shirtless prisoner to an outdoor hitching post for several hours with little water and no bathroom break).

> g. Condoning and encouraging correction officers in the belief that they can violate the rights of persons such as . . . [King] with impunity, and that such conduct will not adversely affect their opportunities for promotion and other employment benefits.

Record Document 1 at ¶ 29. Warden Goodwin and Secretary LeBlanc have asserted qualified immunity as to these claims.

Supervisory officers such as Warden Goodwin and Secretary LeBlanc are not liable under Section 1983 for the actions of subordinates on any theory of vicarious liability. See Alton v. Texas A&M Univ., 168 F.3d 196, 200 (5th Cir. 1999), *citing* Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691-695, 98 S.Ct. 2018, 2036-2038 (1978). "Only the direct acts or omissions of government officials, not the acts of subordinates, will give rise to individual liability under [Section] 1983." Alton, 168 F.3d at 200, *citing* Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 534 (5th Cir.1997). Yet, supervisory officials "may be liable when enforcement of a policy or practice results in a deprivation of federally protected rights." Alton, 168 F.3d at 200, *citing* Doe v. Dallas Indep. Sch. Dist., 153 F.3d 211, 215-216 (5th Cir.1998).

A Section 1983 plaintiff must also "establish that the policy was the moving force behind the violation," that is, "a plaintiff must show direct causation." Peterson v. City of Fort Worth, Tex., 588 F.3d 838, 848 (5th Cir. 2009). "There must be a direct causal link between the policy and the violation." Id.; see also Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir.1992) ("must be more than a mere 'but for'"). This legal standard requires that the policy itself is "so deficient that it is a repudiation of constitutional rights." Thompkins v. Belt, 828 F.2d 298, 304 (5th Cir. 1987).

Here, the Court finds that the undisputed summary judgment evidence establishes that the actions of Warden Goodwin and/or Secretary LeBlanc did not directly create the

circumstances that caused the incident at issue in this case. Defendants have pointed to two key policies in place in June 2016 regarding mental health service screening and services. Louisiana DPSC Health Care Policy No. 38 sets forth a formal suicide prevention plan. See Record Document 37-4, Attachment A. Policy No. 38 proscribes two levels of suicide watch – Standard and Extreme. See id. The policy specifically provides that "generally, inmates who are suicidal should be placed in the least restrictive setting possible and should not be isolated unless their behavior indicates otherwise." Id. at 7.

DPSC/DWCC Employee Policy Memorandum #03-02-0033 (Mental Health Program) sets forth the policies and practices to identify offenders at DWCC who have mental health related problems, to provide a level of mental health care appropriate to the needs of the individual, and to assist personnel in managing the offenders with mental health needs. See id., Attachment B. The memorandum establishes a mental health appraisal process and various Mental Health Service Codes and Levels of Care to assist personnel in identifying the level of care appropriate for each offender experiencing mental health issues. See id.

In his affidavit, Warden Goodwin explained the application of these policies as to King:

> 7. On June 27, 2016, offender Tywaski King was placed on Standard Suicide Watch, per instructions received from Steven Hayden, Director of Mental Health Services at DWCC.
>
> 8. As an offender placed on the level of Standard Suicide Watch on June 27, 2016, offender Tywaski King was determined not to engage in self destructive behavior.

9.  As an offender placed on the level of Standard Suicide Watch on June 27, 2016, offender Tywaski King's behavior did not indicate that he should be isolated.

10. As an offender placed on the Standard Suicide Watch on June 27, 2016, offender Tywaski King sharing a cell with another offender prevented him from being isolated as recommended pursuant to the Health Management Orders in the Department's Health Care Policy No. 38.

Id. at 4.

With these policies in place, it cannot be said that a policy allowing King to share a cell with another offender evidences deliberate indifference on the part of Warden Goodwin or Secretary LeBlanc. The summary judgment record objectively establishes that there was no direct causal link between these aforementioned polices, or any lack of policy/training, and the alleged violation of King's constitutional rights. The DPSC/DWCC policies and practices were not the moving force behind any alleged violation of King's constitutional rights. The policies described above are not so deficient that they are a repudiation of constitutional rights. Accordingly, summary judgment in favor of Warden Goodwin and Secretary LeBlanc is granted as to King's Section 1983 Eighth Amendment claims.

### D. Section 1983 Equal Protection Claims.

In his complaint, King alleges that "in applying prison policies, practices and procedures in the housing, monitoring and supervision of inmates on suicide watch, and responding to acts of and complaints of violence made by them, Defendants intentionally treated [him] differently than other similarly situated inmates on account of his race, and motivated by racial animus deprived him of the equal protection of the laws, in violation of his rights under [the] Fourteenth Amendment to the United States Constitution."

Record Document 1 at ¶ 41. While Defendants contend they seek dismissal of all of King's Section 1983 claims, they focus solely on the Eighth Amendment claim and do not address King's equal protection claim in their motion. Thus, King's equal protection claim survives summary judgment and will proceed to trial.

### E. State Law Claims.

In his complaint, King alleges an intentional infliction of emotional distress claim and an inadequate medical care claim under Louisiana Civil Code Article 2315. See Record Document 1 at ¶¶ 42-46. These claims were not addressed by Defendants in their motion; therefore, King's state law claims survive summary judgment and likewise will proceed to trial.[2]

## III. CONCLUSION

For the reasons set forth above, the Court finds that genuine disputes of material fact exist such that summary judgment must be **DENIED** as to King's Section 1983 Eighth Amendment claims against Captain Huey and Lieutenant Carter. Summary judgment is **GRANTED** as to King's Section 1983 Eighth Amendment claims against Warden Goodwin and Secretary LeBlanc. King's Section 1983 equal protection claims and his state law claims proceed, as Defendants did not move for summary judgment as to these claims.

---

[2] The dispositive motion deadline in this case was August 10, 2018. See Record Document 29. It is unclear to the Court why Defendants did not move for summary judgment as to King's Section 1983 equal protection and state law claims. However, at this late stage of the litigation, the Court will not *sua sponte* raise the issue of summary judgment as to these claims.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 5th day of November, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT